UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AUTOMATED TELLER MACHINE              :
ADVANTAGE LLC,                        :
                                      :
                         Plaintiff,   :
                                      :
            -against-                 :
                                      :   08 Civ. 3340 (RMB) (FM)
VANCE MOORE, JR. a/k/a VANCE MOORE II :
a/k/a VANCE MOORE; EXCLUSIVE          :   **DECISION & ORDER**
PROPERTIES GROUP, INC.; WALTER        :
NETSCHI; 36 MAIN STREET LLC; ATM      :
CAPITAL INC.; DANIELLE JONES; ALAIN   :
BROSSMAN a/k/a HARRY BROSSMAN; and    :
WILLIAM MUNIER,                       :
                                      :
                         Defendants.  :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/6/09

## I.  Introduction

On August 15, 2008, Automated Teller Machine Advantage LLC ("Plaintiff" or "ATMA") filed an amended complaint ("Amended Complaint") against Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance Moore ("Moore"), Exclusive Properties Group, Inc. ("EPG"), Walter Netschi ("Netschi"), 36 Main Street LLC ("36 Main"), ATM Capital Inc. ("ATM Capital"), Danielle Jones ("Jones"), Alain Brossman a/k/a Harry Brossman ("Brossman"), and William Munier ("Munier") (collectively, "Defendants") alleging, among other things, that Defendants "engaged in a complex scheme to defraud Plaintiff of $16.475 million" by "inducing Plaintiff to purchase large numbers of automated teller machines ['ATMs']" that "did not exist." (Am. Compl., dated Aug. 15, 2008 ("AC"), ¶¶ 1, 2, 3.) Plaintiff alleges that Defendants engaged in the fraudulent scheme through an association-in-fact enterprise ("ATM Sales Enterprise"), and that, between November 14, 2005 and January 31, 2008, Defendants "conducted the ATM Sales Enterprise's affairs through a pattern of racketeering activity" consisting of 128 acts of wire

fraud and mail fraud in violation of Sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq. (AC ¶ 108; see also id. ¶¶ 107, 112–244.)

On September 5, 2008, Defendants filed a motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") arguing, among other things, that: (1) Plaintiff's RICO claims are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104–67, § 107, because "[t]he investment at issue here was a security"; (2) Plaintiff fails adequately to allege the RICO "continuity requirement" because "the predicate acts that induced [Plaintiff's] claimed loss spanned less than 10 months"; (3) Plaintiff fails adequately to plead "enterprise" because "merely stringing [the Defendants] together and labeling them an enterprise is insufficient"; (4) the Section 1962(c) RICO claim against EPG fails because Plaintiff does not allege that EPG "had some part in directing the 'operation or management' of the alleged RICO enterprise"; and (5) the Section 1962(d) RICO conspiracy claim against EPG fails because Plaintiff "makes only conclusory allegations regarding [EPG's] agreement to become part of a RICO conspiracy." (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, dated Sept. 5, 2008 ("Def. Mem."), at 15, 19, 20, 23, 24.) Defendants also argue that the RICO claims against EPG should be dismissed because Plaintiff "fails to meet the basic standards for pleading fraud under Fed. R. Civ. P. 9(b)." (Def. Mem. at 25.)

On September 19, 2008, Plaintiff filed an opposition arguing, among other things, that: (1) "the interests in ATMA as a limited liability company [do not] meet the definition[] of a security"; (2) "[t]he allegations in the Amended Complaint demonstrate a pattern of racketeering activity extending beyond two years"; (3) Plaintiff "has properly [alleged] the existence of the

ATM Sales Enterprise as a union or group of individuals associated-in-fact"; (4) "[a]s a result of EPG's participation in the conduct of the ATM Sales Enterprise, a claim under Section 1962(c) has been sufficiently pled"; and (5) Plaintiff "has alleged numerous facts from which a reasonable trier of fact may find that [EPG] conspired to violate [RICO.]" (Pl. Mem. of Law. in Opp'n to Defs.' Mot. to Dismiss, dated Sept. 19, 2008 ("Pl. Mem."), at 2, 21, 24, 25 (internal quotations omitted).) Plaintiff does not appear to respond to Defendants' argument of failure to satisfy the pleading standard of Fed. R. Civ. P. 9(b).

On October 10, 2008, Defendants filed a reply. (See Defs.' Reply Mem. in Supp. of Mot. to Dismiss, dated Oct. 10, 2008 ("Reply").)

The parties waived oral argument.

**For the reasons set forth below, Defendants' motion to dismiss the Amended Complaint is denied.**

## II. Background

For the purposes of this motion, the allegations of the Amended Complaint are taken as true. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008).

Defendant Moore owned and controlled non-party ATM Financial Services LLC ("ATMFS") and he controlled and served as President, Secretary, Treasurer, and Director of Defendant EPG, a holding company that "owns two warehouses from which Moore operates numerous businesses, including ATMFS." (AC ¶¶ 17, 18.) Defendant Netschi is the "managing member" of Defendant 36 Main, which allegedly is "in the business of selling ATMs," (AC ¶¶ 19, 20), and is President of Defendant ATM Capital. (AC ¶ 21.) Defendant Jones is the Secretary, Treasurer, and Vice-President of 36 Main and the daughter of Netschi. (AC ¶ 22.) Defendants Brossman and Munier are "former employees of [Plaintiff]." (AC ¶¶ 23, 24.)

3

On November 14, 2005, Brossman, Munier, Netschi, and Moore met with representatives of the Wolfson Group, a New York corporation "engaged in the management of funds and assets owned by various entities formed primarily for the benefit of members of the Wolfson family," and "offered the Wolfson Group the opportunity to become part of the ATM Venture." (AC ¶ 27; see also id. ¶ 30.) The ATM Venture involved creating a limited liability company to purchase so-called "Placed ATMs," managing the Placed ATMs through the limited liability company, and thereafter receiving monthly revenue generated by the Placed ATMs. (AC ¶ 28.)[1] At the November 14, 2005 meeting, the Wolfson Group "agreed to purchase Placed ATMs from Netschi's company, 36 Main" and agreed to allow Moore, via ATMFS, to manage the Placed ATMs, which included, among other things, "reporting . . . the transaction activity of Placed ATMs, collect[ing] revenue from that transaction activity, and pay[ing] the net revenue to [Plaintiff]." (AC ¶¶ 17, 38.) Brossman and Munier were to be hired as "co-chief executive officers" of the limited liability company. (AC ¶ 41.)

In furtherance of the ATM Venture, the Wolfson Group drafted Plaintiff's Limited Liability Company Agreement, dated November 14, 2005 ("LLC Agreement"). (See AC ¶ 38; see also LLC Agreement, attached as Ex. D to Decl. of John Harris, dated Sept. 5, 2008.) Plaintiff ATMA was the limited liability company that would purchase the Placed ATMs and make periodic distributions to, among others, the holders of its Class A membership interests. (AC ¶ 38; LLC Agreement § 7.4.) Pursuant to the LLC Agreement, the Wolfson Group agreed to contribute $5,000,000 in exchange for 91% of the Class A membership interests of ATMA. (See Schedule A to LLC Agreement; see also LLC Agreement § 5.2.)

The LLC Agreement provides, among other things, that "the management of the business

---

[1]   Placed ATMs are ATMs that have "previously been placed at a location, generally via a lease agreement with a business store owner." (AC ¶ 4.)

4

and affairs of ATMA would be delegated to a [three member] board of managers ['Board'].'' (AC ¶ 39.) The Wolfson Group had the right to appoint two Board members and to "remove, with or without cause, any of its appointees to the Board." (LLC Agreement § 6.1(a).) The Wolfson Group also had the right to inspect ATMA's "books, records, and properties," (LLC Agreement § 11.1), and the authority to dissolve ATMA by "written request." (LLC Agreement § 12.2.)

From November of 2005 through September of 2006, ATMA purchased 940 Placed ATMs from 36 Main for a total of $16.475 million. (AC ¶¶ 3, 49.) Plaintiff alleges that, to induce Plaintiff to purchase the Placed ATMs, Netschi, 36 Main, and Jones created "fictitious" documents purporting to show "the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines"; "the existence of the ATMs purchased by Plaintiff"; "the transaction activity of the ATMs purchased by Plaintiff"; "the locations of the ATMs purchased by Plaintiff"; and "the existence of leases for the placement of the ATMs purchased by Plaintiff." (AC ¶¶ 91, 94.)

Plaintiff further alleges that, after Plaintiff purchased the Placed ATMs, Moore, through his company ATMFS, perpetuated the unlawful scheme by preparing fictitious monthly reports from December of 2005 through November of 2007 ("Monthly Reports"). (AC ¶¶ 59, 98, 99.) The Monthly Reports purported to show "the location, transaction activity, monthly costs[,] expenses, and net revenue" for each Placed ATM purchased by Plaintiff. (AC ¶ 45.) Moore emailed the Monthly Reports to Brossman and Munier who presented the reports to ATMA's Board. (AC ¶ 59.) Moore also allegedly made fraudulent "payments to [Plaintiff] based on the monthly net revenue" of Plainiff's Placed ATMs ("Periodic Revenue Payments") through ATMFS or EPG. (AC ¶¶ 52(i), 61.) Plaintiff alleges that the source of the Periodic Revenue

5

Payments was not the Placed ATM's revenue but "the monies delivered by Plaintiff . . . to 36 Main to purchase the Placed ATMs." (AC ¶ 101.)

In January of 2008, Plaintiff discovered, through a private investigator, that the majority of Plaintiff's Placed ATMs "were not located at the business locations identified by Moore, Netschi, 36 Main, and Jones"; that certain Placed ATMs "may not have ever existed at [such] locations"; and that certain Placed ATMs "were either owned by persons other than Plaintiff and/or were managed by parties other than ATMFS." (AC ¶ 74; see also id. ¶ 73.)

Plaintiff alleges that, between 2002 and 2005, Munier, Brossman, Moore, and Netschi defrauded other investors through a similar scheme. (AC ¶¶ 83–90.)

### III. Legal Standard

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the plaintiff's favor." Fuji Photo Film U.S.A., Inc. v. McNulty, No. 05 Civ. 7869, 2009 WL 2146911, at *2 (S.D.N.Y. July 17, 2009). At the same time, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "[P]laintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "[A] RICO plaintiff normally need only satisfy the general notice pleading requirements." WWE, Inc. v. Jakks Pacific, Inc., 530 F. Supp. 2d 486, 496 (S.D.N.Y. 2007).

6

**IV.     Analysis**

**(1)     PSLRA Bar**

Defendants argue that "Plaintiff pleads an actionable securities fraud based on the investment by the Wolfson Group" because, among other reasons, "the Wolfsons were passive investors relying on others to deliver a profit for them." (Def. Mem. at 14; Reply at 2.) Plaintiff counters, among other things, that "a membership interest in a closely-held limited liability company, particularly where members retain significant managerial rights, will not constitute a 'security' because such members are not passive investors" and, pursuant to the LLC Agreement, "the Wolfson Group appointed two of the three managers of the Board." (Pl. Mem. at 4, 13 (emphasis omitted).)

The PSLRA "bars private causes of action under RICO for predicate acts that describe conduct that would otherwise be actionable as securities fraud." Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009); see also 18 U.S.C. § 1964(c). "A preliminary issue is whether the scheme involved 'securities,' as that term is defined by the Securities Act of 1933 [and] the Securities and Exchange Act of 1934." OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp 2d 357, 369 (S.D.N.Y. 2005).

LLC membership interests are not "securities" unless they meet the definition of an "investment contract" set forth in SEC v. W.J. Howey Co., 328 U.S. 293, 300 (1946) (the "Howey test"). See Keith v. Black Diamond Advisors, Inc., 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999). To satisfy the Howey test, there must be "'[i] an investment of money [ii] in a common enterprise [iii] with profits to come solely from the efforts of others.'" Endico v. Fonte, 485 F. Supp. 2d 411, 412 (S.D.N.Y. 2007) (quoting Howey, 328 U.S. at 300). The third prong of the Howey test is not met if, at the time of the investment, the investor possesses a "'reasonable

7

expectation . . . of significant investor control.'" United States v. Leonard, 529 F.3d 83, 88 (2d Cir. 2008) (quoting SEC v. Aqua-Sonic Products Corp., 687 F.2d 577, 585 (2d Cir. 1982)); see also Endico, 485 F. Supp. 2d at 415 n.16.

At this stage of the case when no discovery has occurred, the Court cannot determine whether the Wolfson Group's LLC membership interests in ATMA are investment contracts. Even assuming, arguendo, that the Wolfson Group invested money in a common enterprise, it appears from the Amended Complaint that, at the time of its initial investment into ATMA, the Wolfson Group had a "reasonable expectation of significant investor control" based upon its rights under the LLC Agreement. See Great Lakes Chemical Corp. v. Monsanto Co., 96 F. Supp. 2d 376, 392 (D. Del. 2000) ("to determine whether a member's profits are to come solely from the efforts of others, it is necessary to consider the structure of the particular LLC at issue, as provided in its operating agreement").[2] For example, the Wolfson Group had the right to appoint two of the three members of the Board and the right to "remove, with or without cause, any of its appointees to the Board." (LLC Agreement § 6.1(a)); see Monsanto, 96 F. Supp. 2d at 390 ("the court finds that the [plaintiff's] profits from [the LLC company] did not come solely from the efforts of others" because, among other reasons, plaintiff retained the "power to remove any [m]anager with or without cause"). The Wolfson Group also possessed "full access" to ATMA's "books, records, and properties." (LLC Agreement § 11.1); see Nelson, 173 F. Supp. 2d at 166 ("[p]laintiffs had access to investment information"); see also Hirsch v. DuPont, 396 F.

---

[2] The Court may consider the LLC Agreement for purposes of deciding Defendants' motion to dismiss because the Agreement is referenced in and, thus, is "integral" to the Amended Complaint. (See Am. Compl. ¶¶ 38–40); see also Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005); Nelson v. Stahl, 173 F. Supp. 2d 153, 159 (S.D.N.Y. 2001) ("The Court finds that the . . . LLC Agreements are integral to the complaint and, accordingly, has considered their contents in evaluating the sufficiency of the complaint.").

Supp. 1214, 1222 (S.D.N.Y. 1975) ("by virtue of their managerial powers and express rights of inspection, [plaintiffs] could inform themselves as to the condition of the business and, through their efforts, promote its success"). And, the Wolfson Group retained the power to dissolve ATMA by written request. (See LLC Agreement § 12.2); see also Monsanto, 96 F. Supp. 2d at 392 (members of LLC company not passive investors where, among other things, they "had the power . . . to dissolve the company" under the LLC agreement).

Whether or not the ATMA membership interests are ultimately determined to be investment contracts is "more appropriately addressed in a summary judgment motion." Jones v. Deutsche Bank AG, No. 04 Civ. 5357, 2005 WL 2007892, at *2 (N.D. Cal. Aug. 12, 2005).

### (2)   RICO Continuity

Defendants argue, among other things, that Plaintiff fails "to show how the alleged RICO scheme satisfies the [closed-ended] continuity requirement inasmuch as there was no more than 9 ½ months during which [P]laintiff was involved in funding ATM purchases"; "[t]his duration fails to meet the minimum two years necessary to find closed-ended continuity"; and although "[P]laintiff seeks to extend the time period by referencing several emails, receipt of a final periodic revenue payment and receipt of a final monthly report occurring after [September 29, 2006]," this "argument should be rejected because, as a matter of law, the predicate acts ended when [P]laintiff decided not to invest further money in the ATM Venture after September 26, 2006." (Reply at 1–2, 7–8.)

Plaintiff counters persuasively, among other things, that it "alleges 128 predicate acts – all essential to the successful operation of the ATM Sales Enterprise – which were committed from November of 2005 through January of 2008" which is "a period of more than two years"; "the ATM Sales Enterprise victimized other purchasers besides [Plaintiff]"; and "Defendants

9

incorrectly argue that this Court should simply ignore any predicate acts not directly associated with the sales of the [Placed ATMs] and consider all other predicate acts as a 'cover-up' of the sales." (Pl. Mem. at 19, 20 (emphasis omitted).)

"The predicate acts alleged by [a RICO] plaintiff must be related and continuous." McNulty, 2009 WL 2146911, at *4. "The latter so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern . . . or by demonstrating an 'open-ended' pattern of racketeering activity." Spool, 520 F.3d at 183. "To satisfy closed-ended continuity, the plaintiff must [allege] 'a series of related predicates extending over a substantial period of time,'" Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quoting H.J. Inc. v. Northwestern Bell. Tel. Co., 492 U.S. 229, 242 (1989)), and "[a]t the pleading stage, [this] hurdle is relatively low," WWE, 530 F. Supp. 2d at 497.

A period of at least two years is "typically required to constitute a 'substantial period of time,'" Physicians Mut. Ins. Co. v. Greystone Servicing Corp., No. 07 Civ. 10490, 2009 WL 855648, at *7 (S.D.N.Y. Mar. 25, 2009), but "a scheme's duration alone is not dispositive [and] the court must examine the overall context in which the acts took place," Pier Connection, Inc. v. Lakhani, 907 F. Supp. 72, 78 (S.D.N.Y. 1995) (internal quotations omitted). Courts also consider the "number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes." DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001).

Plaintiff adequately alleges closed-ended continuity, see SKS Constructors, Inc. v. Drinkwine, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006), by alleging that Defendants engaged in 128 acts of mail fraud and wire fraud "between November 14, 2005, when Netschi delivered [f]ictious [t]ransaction [d]ocuments to a representative of the Plaintiff, and . . . January 31, 2008, when Brossman delivered [f]ictitious Monthly Reports to a representative of the Plaintiff," (AC

¶ 112; see id. ¶¶ 114–244); see also McNulty, 2009 WL 2146911, at *9 ("[t]he scheme involved numerous predicate acts and multiple participants, including both corporate and individual defendants"), and because the Amended Complaint "refers not only to the defrauding of the Plaintiff company, but to a arger scheme to defraud [others]," SKS, 458 F. Supp. 2d at 80. (See AC ¶¶ 75–90.)

And, Defendants' argument that "the predicate acts ended when [P]laintiff decided not to invest further money in the ATM Venture after September 26, 2006," (Reply at 8), is unpersuasive because Defendants' alleged post-September 2006 acts of mail fraud and wire fraud – which involved, among other things, the forwarding to Plaintiff of fictitious Monthly Reports purporting to show the transaction history of Plaintiff's Placed ATMs (see AC ¶¶ 59–60, 98–104) – were part of the same fraudulent scheme and "lulled [the Wolfson Group] into not seeking a return of [its] money." Local 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545, 567 (E.D.N.Y. 1998); see also OSRecovery, 354 F. Supp 2d at 374 ("[t]hese alleged acts were not simply an effort to cover up or conceal past conduct, but were additional acts of fraud").[3]

(3) **RICO Enterprise**

Defendants argue, among other things, that the Amended Complaint "simply groups together the [Defendants] and calls them 'the ATM Sales Enterprise' without identifying any structure." (Def. Mem. at 20.) Plaintiff counters, among other things, that the Amended Complaint sufficiently pleads that the Defendants constitute an association-in-fact enterprise (i.e., the ATM Sales Enterprise) that engaged in a "course of fraudulent and illegal conduct"

---

[3] "Having found that the Amended Complaint has satisfied the RICO continuity requirement by alleging sufficiently a closed-ended pattern of racketeering, the argument for open-ended continuity will not be addressed." Pollack, 992 F. Supp. at 567 n.12; (see also Pl. Mem. at 21.)

11

including "the sale and contin[ed] servicing of phantom Placed ATMs." (Pl. Mem. at 23.)

A plaintiff alleging an association-in-fact RICO enterprise must plead the existence of a group of individuals or other legal entities with "[i] a purpose, [ii] relationships among those associated with the enterprise, and [iii] longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 129 S. Ct. 2237, 2244 (2009); see also United States v. Turkette, 452 U.S. 576, 580 (1981). This test "establishes a low threshold for pleading [an association-in-fact] enterprise." McGee v. State Farm Mut. Auto. Ins. Co., No. 08 Civ. 392, 2009 WL 2132439, at *4 n.7 (E.D.N.Y. July 10, 2009).

Plaintiff sufficiently pleads that the ATM Sales Enterprise is an association-in-fact RICO enterprise, see McNulty, 2009 WL 2146911, at *6; see also Breslin Realty Dev. Corp. v. Schackner, 397 F. Supp. 2d 390, 402–03 (E.D.N.Y. 2005), by alleging that the Defendants were united in a common purpose to defraud Plaintiff by "induc[ing] Plaintiff . . . to enter into agreements to purchase Placed ATMs which [did] not exist in exchange for the receipt of millions of dollars." (AC ¶ 109); see also McNulty, 2009 WL 2146911, at *6 ("the association-in-fact was united by a common purpose, namely that of defrauding [plaintiff]").

Plaintiff also details the relationships among the members of the ATM Sales Enterprise. Brossman, Munier, and Netschi allegedly acted as "front-men" who ensured the Wolfson Group conducted business with the other Defendants by fraudulently misrepresenting the true nature of the other Defendants' operations. (AC ¶¶ 26–27, 30–37, 91.) Jones, 36 Main, and ATM Capital made material misrepresentations to fraudulently induce Plaintiff to purchase Placed ATMs. (AC ¶¶ 52, 92, 94.) And, Moore and EPG transmitted the false Monthly Reports and Periodic Revenue Payments to Plaintiff. (AC ¶¶ 59–61, 95, 98, 100); see also Liberty Mut. Ins. Co. v. Blessinger, No. 06 Civ. 391, 2007 WL 951905, at *12 (E.D.N.Y. Mar. 27, 2007) ("the details in

12

the complaint regarding how the various enterprises operated and the roles played by each member sufficiently allege that the defendants were associated-in-fact").

And, Plaintiff alleges that Defendants engaged in acts of mail fraud and wire fraud between November 14, 2005 and January 31, 2008. (See AC ¶¶ 112, 114–244); see also McNulty, 2009 WL 2146911, at *6 ("the association-in-fact performed as a continuing unit that engaged in predicate acts of fraud and commercial bribery over a nine-year period").

### (4) Section 1962(c) RICO Claim Against EPG

Defendants argue, among other things, that "[P]laintiff has not made any substantive allegations about [EPG] conducting the operation and management of the alleged RICO enterprise." (Def. Mem. at 23.) Plaintiff counters, among other things, that EPG participated in the ATM Sales Enterprise by transferring to Plaintiff "the Periodic Revenue Payments associated with the fraudulent Monthly Reports" through "its sole principal, Moore." (Pl. Mem. at 24.)

A defendant "is liable under [Section 1962(c) of] RICO only if he participated in the operation or management of the enterprise itself." Satinwood, 385 F.3d at 176 (internal quotations omitted); see also Reves v. Ernst & Young, 507 U.S. 170, 183 (1993). "To satisfy the operation or management test, a plaintiff must allege facts sufficient to establish that a RICO defendant 'ha[d] some part in directing the enterprise's affairs.'" In re SmithKline Beecham Clinical Labs., Inc., 108 F. Supp. 2d 84, 99 (D. Conn. 1999) (quoting Reves, 507 U.S. at 179). The "'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." Satinwood, 385 F.3d at 176.

Plaintiff adequately alleges that EPG took "some part" in directing the ATM Sales Enterprise, see Jerry Kubecka, Inc. v. Avellino, 898 F. Supp. 963, 970 (E.D.N.Y. 1995), by alleging, among other things, that "Moore is the President, Secretary, Treasurer, and Director of

13

EPG" and that on May 14, 2007, May 16, 2007, and June 18, 2007, "in furtherance of the ATM Sales Enterprise, Moore caused [EPG] to transmit" a total of $422,382.50 to Plaintiff's bank account "representing Periodic Revenue Payments" for Plaintiff's Placed ATMs. (AC ¶¶ 18, 141, 142, 144; see also id. ¶ 100.) Because Moore allegedly operated and controlled EPG and took part in the direction of the ATM Sales Enterprise, on behalf of his company, EPG "may be said to have had some part in [the ATM Sales Enterprise's] direction," as well. Avellino, 898 F. Supp. at 970; see Pollack, 992 F. Supp. at 568–69 (E.D.N.Y. 1998); see also Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 91 Civ. 2050, 1995 WL 43669, at *3 (S.D.N.Y. Feb. 2, 1995).

### (5)  Section 1962(d) RICO Conspiracy Claim Against EPG

Defendants argue, among other things, that EPG's "close association with those involved in the alleged RICO enterprise is an insufficient basis from which an inference of conspiracy can be drawn." (Defs. Mem. at 24.) Plaintiff counters, among other things, that "EPG was fully aware of the existence of the ATM Sales Enterprise" because "it is a holding company owned and operated by Moore." (Pl. Mem. at 24.)

Section 1962(d) of RICO prohibits any person from conspiring "to violate any of the substantive provisions of RICO" including Section 1962(c). McNulty, 2009 WL 2146911, at *5. To state a claim under Section 1962(d), a plaintiff must allege that the defendant "'adopt[ed] the goal of furthering or facilitating the criminal endeavor.'" Mezzonen v. Wright, No. 97 Civ. 9380, 1999 WL 1037866, at *12 (S.D.N.Y. Nov. 16, 1999) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)); see also Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990).

Plaintiff adequately alleges a Section 1962(d) RICO conspiracy claim against EPG. See

Mezzonen, 1999 WL 1037866, at *12. As noted above, Plaintiff alleges that Moore "controlled" EPG as its "President, Secretary, Treasurer, and Director" and – through EPG – transmitted to Plaintiff the Periodic Revenue Payments that purportedly represented the Placed ATMs' revenue in furtherance of the Defendants' scheme. (AC ¶¶ 18, 141, 142, 144.) Because Plaintiff alleges that Moore "knew about and agreed to participate in the scheme, [P]laintiff has properly pled that [EPG through its agent Moore] conspired to violate RICO," as well. Metro. Transp. Auth. v. Contini, No. 04 Civ. 104, 2005 WL 1565524, at *6 (E.D.N.Y. July 6, 2005); see also Pollack, 992 F. Supp. at 569.

### Fed. R. Civ. P. 9(b)

Defendants argue, among other things, that Plaintiff "fails to meet the basic standards for pleading fraud [against EPG] under Fed. R. Civ. P. 9(b)" because Plaintiff alleges that EPG forwarded payments to Plaintiff's bank account but "does not allege that [EPG] made any fraudulent representations regarding those payments." (Def. Mem. at 25.) As noted, Plaintiff does not appear to respond to Defendants' argument. (See Pl. Mem. at 1–25.)

Fed. R. Civ. P. 9(b) "applies to RICO claims based on allegations of fraud." Eastchester Rehab. & Health Ctr., L.L.C. v. Eastchester Health Care Ctr., L.L.C., No. 03 Civ. 7786, 2005 WL 887154, at *3 (S.D.N.Y. Apr. 15, 2005). Where, as here, a "plaintiff claims that mail and wire fraud took place in furtherance of a larger scheme to defraud, the communications themselves need not have contained false or misleading information," Breslin, 397 F. Supp. 2d at 398, and, in such cases, Fed. R. Civ. P. 9(b) "is satisfied so long as the mailings and wire transfers alleged further an underlying scheme that itself has a fraudulent, deceptive purpose." Id.; see also Am. Med. Ass'n v. United Healthcare Corp., 588 F. Supp. 2d 432, 442–43 (S.D.N.Y. 2008).

Plaintiff's allegations with respect to EPG satisfy Fed. R. Civ. P. 9(b) because, among other reasons, Plaintiff details the fraudulent nature of Defendants' scheme, (see AC ¶¶ 26–82, 91–104), and alleges that Moore caused EPG to wire the Periodic Revenue Payments to Plaintiff's bank account "in furtherance of" Defendants' fraudulent scheme. (AC ¶¶ 141, 142, 144); see Jerome M. Sobel & Co. v. Fleck, No. 03 Civ. 1041, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003) ("[T]he overall scheme to defraud by Fleck has been described in detail and the complaint clearly explains the relationship between the mailings or wire communications and the scheme to defraud. Accordingly, it is sufficient to satisfy Rule 9(b)."), adopted by, 2004 WL 48877 (S.D.N.Y. 2004); see also Breslin, 397 F. Supp. 2d at 401–02.

## V.   Conclusion and Order

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint [#34] is denied in its entirety.

The parties are directed to participate in a status/settlement conference on Tuesday, September 15, 2009, at 9:00 a.m., in Courtroom 21B, 500 Pearl Street, New York, New York. **The parties are directed to engage in good faith settlement negotiations prior to the conference.**

Dated: New York, New York
       August 6, 2009

*Richard M. Berman*

RICHARD M. BERMAN, U.S.D.J.